IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ERIC SCOTT HARDWICK, #2219442 | § | |
| VS. | § | CIVIL ACTION NO. 6:21cv201 |
| JIMMY BOWMAN, ET AL. | § | |

REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE

Plaintiff Eric Scott Hardwick, a prisoner confined at the Powledge Unit within the Texas Department of Criminal Justice (TDCJ), proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit complaining of alleged violations of his constitutional rights. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The present Report concerns Defendants' motion for summary judgment, (Dkt. #30). Plaintiff did not file a response. For reasons explained below, the Court recommends that the motion be granted—and that all claims be dismissed with prejudice.

**I. Hardwick's Complaint**

Hardwick's initial complaint, (Dkt. #1), is the operative pleading in this case. He sues Bryan Collier, TDCJ Director, former Senior Warden Bowman, TDCJ, and the TDCJ State Classification Committee (SCC) for injunctive and declaratory relief. He further seeks monetary damages.

The crux of Hardwick's complaint is that Defendants acted with deliberate indifference to his serious medical needs—and the medical needs of other prisoners at the Powledge Unit—by failing or refusing to install air conditioning throughout the unit. Specifically, Hardwick states the following:

1

> Since 2011, at least twelve prisoners have died from heat stroke because of the sweltering temperatures inside buildings where the Texas Department of Criminal Justice houses inmates. Hundreds more have suffered heat-related illnesses, many of whom were housed at the Powledge Unit. Despite this, TDCJ has done nothing to lower the temperatures inside the housing areas at the Powledge Unit. As this inflicts needless suffering on prisoners, and exposes them—many of whom are sick, elderly, and disabled—to risk of harm, Plaintiff asks the Court to enjoin TDCJ and TBCJ from continuing this dangerous practice. Plaintiff, on behalf of himself and those similarly situated, brings this lawsuit because the TDCJ refuses to cool inmate housing areas, despite the dangerously hot indoor temperatures prisoners are forced to live in.

(Dkt. #1, pg. 5). Hardwick insists that Defendants knowingly subject him and other prisoners to extremely hot temperatures in violation of the Eighth and Fourteenth Amendments.

Hardwick describes the Powledge Unit as a medical and geriatric prison, where indoor prisoner housing is not climate controlled. *Id*. at pg. 6. The ventilation system throughout the prison does not lower the temperature indoors; rather, he explains, the ventilation system merely "brings in fresh air from outside while pumping out stale hot air from the inside." *Id*. Hardwick asserts that it is often hotter inside the housing areas than it is outside. The walls—consisting of metal and thin insulation—become too hot to the touch during the summer and "hold heat in like a parked car." Because the steel and concrete tables within the dormitories become so hot, "prisoners have to lay towels down on the tables to rest their elbows while sitting at the tables." *Id*. at pg. 7. Prisoners routinely sleep on concrete floors. Hardwick asserts, therefore, that TDCJ knows "there is little difference between the indoor and outdoor temperatures at the Powledge Unit." *Id*.

He further states that the Defendants are aware that very few locations inside the prison have air conditioning—and a prisoner's time in these places is limited. Hardwick cites the law library, which prisoners are only permitted to attend for two hours, the education building, and the medical department. However, the Warden's office, administrative offices, and the prison armory are air conditioned. *Id*. at pg. 7. Hardwick maintains that there are no air-conditioned beds for prisoners inside the unit, and no penological purpose for refusing to install air conditioning.

Hardwick further insists that the extreme temperatures threaten illness, injury, and death to prisoners. Specifically, he contends that excessive heat stresses the body and forces the heart to beat faster—further causing heat exhaustion, heat cramps, and heat stroke. Moreover, he highlights that TDCJ recognizes that those prisoners with pre-existing medical conditions—such as obesity, diabetes, hypertension, cardiovascular disease, asthma, thyroid dysfunction, etc.—are at an increased risk for heat illness and death, (Dkt. #1, pg. 11). Hardwick states, based on his information and belief, that numerous prisoners at the Powledge Unit suffer from medical conditions that impair the body's ability to cool.

He explains that he suffers from a disability that requires reasonable accommodation due to the heat. Highlighting his hypertension, obesity, diabetes, asthma, Post Traumatic Stress Disorder (PTSD), cardiovascular disease, and previous strokes, Hardwick explains that he is at higher risk for heat-related issues and has suffered from heat exhaustion in the past. *Id*. at pg. 17.

Furthermore, Hardwick maintains that Defendants Collier and Bowman were deliberate indifferent "to the substantial risk of serious harm to [him] and other prisoners at the Powledge Unit caused by their choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and w[antonly] caused [him] pain." *Id*. at pg. 20. By refusing to provide safe housing areas that protect prisoners from exposure to extreme heat, which annually cause injuries to prisoners, Defendants are liable under the Eighth Amendment.

Finally, under the Americans with Disabilities Act and the Rehabilitation Act, Hardwick insists that he is "a qualified individual" with a physiological or mental impairment that substantially limit one or more major life activities. He contends that TDCJ fails to accommodate prisoners with heat-sensitive disabilities—heat-sensitive disabilities that "cause them to suffer more pain and punishment than able-bodied prisoners." *Id*. at pg. 21. Hardwick asserts that he is

qualified to participate in programs and services within TDCJ such as "incarceration in the inmate housing areas," (Dkt. #1, pg. 22).

## II. Defendants' Motion for Summary Judgment

The Court ordered Defendants to answer Hardwick's complaint and they subsequently filed both an answer, (Dkt. #18), and a motion for summary judgment, (Dkt. #30), along with several attachments. While Hardwick was granted an extension of time in which to file a response, (Dkt. #34), he has not filed any response to the motion for summary judgment.

Defendants maintain that TDCJ has expanded its measures to mitigate the effects of high temperatures, reducing the low-risk of prisoners developing heat-related illnesses. TDCJ has also implemented a new process to identify certain prisoners who may be at an increased risk of heat-related illnesses into air-conditioned housing, as every TDCJ prisoner is assessed by medical personnel and given a "Heat Sensitivity Score" based on their medical conditions and prescribed medications. Accordingly, Defendants assert that Hardwick's claim that they are deliberately indifferent is without merit. They also assert that there is no constitutional right that entitles him to an air-conditioned prison.

Defendants further argue that the conditions of Hardwick's confinement do not offend constitutional standards, let alone "shock the conscience." They maintain that he cannot show a violation of the ADA or RA—and that there is no evidence that his ability to thermoregulate is impaired. Defendants also assert that Hardwick has not identified a single program or service from which he was excluded and, similarly, has not identified any discrimination by reason of his disability. Defendants assert that they are entitled to qualified immunity. As mentioned, Hardwick has not responded to these arguments, and the evidence is therefore undisputed.

### III. Summary Judgment Evidence

Defendants attached several exhibits in support of their motion for summary judgment:

**Exhibit A: Hardwick's Relevant Prison Grievances, with supporting business record affidavit;**

**Exhibit B: Hardwick's Relevant Medical Records, with supporting business record affidavit;**

**Exhibit C: Hardwick's Relevant Prison Classification/Health Summary Records, with supporting business record affidavit;**

**Exhibit D: 2022 Affidavit of Senior Warden of the Powledge Unit, Nicole F. Sandifer and TDCJ Administrative Directive concerning Excessive and Extreme Temperature; and**

**Exhibit E: 2022 Affidavit of Program Supervisor, Susanna Douglas**

<u>1. Relevant Medical and Classification Records</u>

Hardwick's medical records show that he has several work-related restrictions, but no housing restrictions. Specifically, the summary judgment evidence indicates that Hardwick is to be assigned a prison facility that is single-level and that he is not suitable for a trustee camp, (Dkt. #31, pg. 5; 6). He is also assigned to a lower-bunk only. As for work restrictions, Hardwick has restrictions concerning bending at the waist, repetitive squatting, climbing, wet/uneven surfaces, direct sunlight, temperature extremes, humidity extremes, no work requiring safety boots, no work around a machine that consists of moving parts, walking, lifting, and limited standing. *Id*.

His health summary, dated November 16, 2020, shows that he has no housing restrictions, (Dkt. #30, pg. 69). Medical providers also noted that Hardwick has no heat sensitivities, and that his "Heat Score" is blank. *Id*. at pg. 72. The Classification Department classified his "Heat Score" as a 0—and the records do not show that he has ever had a "Heat Sensitive Score," (Dkt. #30, pg. 112).

Ms. Douglas provided a detailed account of TDCJ's classification procedures and policies. Each prisoner is assigned a unit by a State Classification Committee (SCC) member, in which a prisoner's medical, program, safety, and security needs are evaluated and taken into account. *Id*. at pg. 111. A Health Summary for Classification System screen, medical provider correspondence, and other records are used to assist committee members in assigning a prisoner to a specific facility. Ms. Douglas notes, "[f]or example, some medical providers direct SCC to assign an inmate to a specific unit due to the medical care at that facility to meet the inmates' medical needs and some medical providers add restrictions to the inmate and the SCC member screens and assigns the unit that is most appropriate to meet those restrictions." *Id*.

Each prisoner is assigned by medical at intake and throughout their incarceration. When medical personnel assess and input medical information, a "Heat Sensitivity Score" (HSS) is automatically populated, and this score can change as a prisoner's medical needs change. A HSS Report is generated daily—and is used by SCC members "to assign, coordinate and schedule transportation for prisoners with a HSS to a cool bed." *Id*.

Ms. Douglas further reports that Sheltered Housing (SHU) is "a medical assigned housing area for inmates with special needs who do not require infirmary care but have medical needs that cannot be met in a general population environment." *Id*. at pg. 112. She explains that while units with SHU areas are air conditioned, "inmates are not assigned to Sheltered Housing for heat sensitivity." Rather, they are assigned there because they require higher level of access to medical staff that cannot be met in general population; medical providers manage these SHU areas.

She explains that Hardwick was assigned at the Telford Unit SHU from May 16, 2019, until November 16, 2020, (Dkt. #30, pg. 112). A Health Services Liaison submitted correspondence to SCC explaining that Hardwick required Sheltered Housing. In January 2020, a

liaison submitted additional correspondence that Hardwick needed wheelchair housing along with medical treatment—at which point SCC placed Hardwick on a waiting list for wheelchair housing. *Id*. On November 4, 2020, SCC reviewed Hardwick's medical restrictions and reassigned him to the Powledge Unit; on November 16, 2020, Hardwick was moved from the Telford SHU to general population housing at the Powledge Unit. Ms. Douglas explains that "inmate Hardwick does not have an HSS (Heat Sensitivity Score), and has he never had one listed on his record to show a need for cool bed assignment," (Dkt. #30, pg. 112).

A review of Hardwick's Health Summary for classification purposes confirms Ms. Douglas's report. Medical providers noted that Hardwick has no heat sensitivities, and that his "Heat Score" is blank. *Id*. at pg. 72. The Classification Department classified his "Heat Score" as a 0—and the records do not show that he has ever had a "Heat Sensitive Score," (Dkt. #30, pg. 112).

<u>2. TDCJ Heat Mitigation Strategies and Procedures</u>

The summary judgment evidence includes TDCJ's Administrative Directive, dated May 8, 2020, concerning excessive temperatures and an affidavit from Ms. Sandifer, Senior Warden of the Powledge Unit. Mandatory heat mitigation strategies are employed at the Powledge Unit from April 15 to October 31 every year, (Dkt. #30, pg. 82). She explains that she personally oversees the implantation of all heat mitigation measures outlined in the Directive.

Specifically, Ms. Sandifer states that she has personally observed—and posted—safety posters and the annual "Seasonal Preparedness Directive" instructing prisoners throughout the Powledge Unit on how to avoid heat illness. Ice water is available in accessible coolers 24 hours per day to the prisoners, and "all correctional officers are responsible for keeping the coolers in their area of assignment always filled with ice and water." *Id*. at pg. 82. Extra ice is stored during

the summer; the captain reports weekly on the number of pounds of extra ice. Cups are available to all prisoners at all times during bouts of excessive heat and prisoners may keep their cup on their person; any indigent prisoner will be provided a cup.

She further explains that there are over six air-conditioned areas within the Powledge Unit that can be used as respite areas. Primary respite areas include: the non-contact/chain room, captain's lobby, infirmary holding area, prisoner barbershop, the lieutenant's office, and the trusty camp visitation area. There are additional air-conditioned areas within the Unit, including the contact visitation and the major's hallway areas, (Dkt. #30, pg. 83). Overflow respite areas are available to be used in emergency situations if the need arises. A prisoner can request respite at any time, 24 hours per day—and may stay in respite as long as requested. The prisoner is not required to be examined by medical personnel in order to access respite.

Moreover, cool-down showers are available to prisoners throughout the summer. Prior to April 15, the beginning of the use of various mandatory heat mitigation strategies, "facility maintenance staff lowers the hot water output and converts one entire bank of showers to cool water showers only," and every prisoner who requests a cool-down shower will be allowed one daily during the summer months. *Id*. at pg. 83. Each prisoner has access to a personal fan, and if a prisoner cannot afford one, the prison will supply one through the "Indigent Fan Program." Additionally, "there are large fans to recirculate air in the corners of all dorms, chow halls, and the trustee camp day room. Fans are monitored throughout the summer to ensure they are in working order." *Id*. 83-84.

Prisoners are further permitted to wear shorts and T-shirts while in the day room and are permitted to "utilize and carry cooling towels." They can purchase sports-drink powder from the

commissary, and Ms. Sandifer explains that she ensures that "the commissary supervisor makes periodic orders of sports drink powder throughout the summer" to avoid shortages. *Id*. at pg. 84.

Ms. Sandifer explains that her duties include "ensuring that medical identifies the inmates susceptible to developing heat sensitivity and that the unit classification changes or limits their work assignment based on any medical reassignment." She also notes that she enforces the requirement that all correctional officers perform wellness checks every 30 minutes on the inmates on the wellness checklist, as provided by the medical department, (Dkt. #30, pg. 84). Ms. Sandifer highlights that she also actively monitors the temperature and heat index values—further seeing that those values are announced and recorded "every hour on the half hour." *Id*. The summary judgment evidence includes blank examples of TDCJ's daily temperature log, confirming Ms. Sandifer's account. *Id*. at pg. 104.

**IV. Standard of Review**

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994). Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

The Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).  It is not the function of

the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Hardwick has not filed a response to the motion for summary judgment. Where a party does not respond to a summary judgment motion, such failure does not permit the court to enter "default" summary judgment. *See Everly v. MBank Dall.*, 843 F.2d 172, 174 (5th Cir. 1988). A court is, however, permitted to accept the movant's facts as undisputed when no response or opposition is filed. *Id*. In this case, Hardwick has not filed a response to Defendants' motion for summary judgment—therefore, Hardwick failed to present summary judgment evidence to dispute Defendants' version of the facts or their arguments supporting summary judgment. *See, e.g.*, *Stone v. United States*, 2011 WL 3652758, *2 (E.D. Tex. July 22, 2011).

**V. Discussion and Analysis**

The Court understands that Hardwick raises a claim concerning deliberate indifference to his health and safety in violation of the Eighth Amendment. He also argues that his rights were violated under the ADA and RA. However, a review of the uncontested summary judgment evidence, viewed in the light most favorable to Hardwick, shows that the evidence before the Court could not lead to different factual findings and conclusions. In other words, summary judgment in favor of the Defendants is appropriate.

Hardwick maintains that Defendants violated his rights under the Eighth Amendment by failing or refusing to install air conditioning in the Powledge Unit. He insists that Defendants, as prison officials, know that the prison experiences extremely hot temperatures and that prisoners suffer heat-related illnesses—but they intentionally do nothing. Hardwick asserts that "no

mitigation measures short of climate control or a policy to relocate inmates to cooler housing can adequately protect people from these extreme temperatures," (Dkt. #1, pg. 15).

Moreover, Hardwick states that he has medical conditions that are exacerbated by extreme heat, which poses a risk of illness and death. He also explains that he has a disability and previously suffered from heat-related illness. Hardwick asserts that Defendants have discriminated against him by failing and refusing to protect him from temperature extremes. *Id*. at pg. 22.

1. Unconstitutional Conditions of Confinement

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on convicted criminals and extends to deprivations suffered during imprisonment. *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016). The Amendment encompasses "reasonable safety," which includes the protection against "unsafe conditions that pose an unreasonable risk of serious damage [to the inmate's] future health." *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

To establish an Eighth Amendment violation in this context, a prisoner must show that the alleged deprivation posed a "substantial risk of serious harm" and that the defendant acted or failed to act with deliberate indifference to the risk. *See Farmer v. Brennan*, 511 U.S. 824, 834 (1994). A prisoner must show that defendants acted in a manner that "shocks the conscience"; in other words, "the court must assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Legate*, 822 F.3d at 210 (quoting *Helling*, 509 U.S. at 36).

The Court of Appeals for the Fifth Circuit has held that whether a risk is "substantial" and whether the threatened harm is serious presents an objective test—and whether prison officials consciously disregarded the risk of harm presents a subjective test. *See Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015). To satisfy the objective component, a prisoner must show an "objectively

intolerable risk of harm." *Douthit v. Collier*, 2022 WL 5240152, at *3 (5th Cir. Oct. 5, 2022). Under the subjective component, moreover, the charged officials must act with a sufficiently culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1981).

If the prison officials involved acted with deliberate indifference to the prisoner's health or safety, they may be culpable; however, the deliberate indifference standard is extremely difficult to meet. *Farmer* 511 U.S. 825 at 835; *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006). An official acts with deliberate indifference only if he knows prisoner's face a substantial risk of serious bodily harm *and* he disregards that risk by failing to take measures to abate it. *Gobert*, 463 F.3d at 346. It is well-settled that deliberate indifference cannot be inferred from negligent or even a grossly negligent response to a substantial risk of harm; rather, "it requires a showing of wanton disregard for the prisoners' safety or recklessness." *See Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021).

Here, accordingly, this Court's inquiry centers on whether Defendants "recklessly disregarded the risk" of extremely hot temperatures at the Powledge Unit. The uncontested summary judgment evidence reveals that Defendants employ extensive heat-mitigation strategies and procedures at the Powledge Unit, thereby refuting any argument that Defendants consciously disregarded a risk to Hardwick's health and safety. Contrary to his own contentions, the uncontested evidence does not show that "TDCJ has done nothing"; in fact, the evidence shows the opposite.

### a. Air Conditioning and the Eighth Amendment

Hardwick ultimately seeks a Court order directing prison officials to install air conditioning through the Powledge Unit. The Fifth Circuit has held that the Eighth Amendment "guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate

remedial measures." *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017). As Defendants stress, however, the Fifth Circuit has repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons. Moreover, the Court repeatedly declined to establish any maximum temperate levels or requirements. *See Ball v. Leblanc*, 792 F.3d 584, 599 (5th Cir. 2015) (holding that a district court's injunction ordering air conditioning violated the PLRA because it "was unnecessary to correct the Eighth Amendment violation," as plaintiff's are not entitled to the most effective available remedy.); *Blackmon v. Garza*, 484 F. App'x 866, 872 n.6 (5th Cir. 2012) (explaining that "we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment."); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004).

*Ball v. LeBlanc* is instructive. The district court in that case issued a permanent injunction requiring the state to lower temperatures inside the prison to 88 degrees Fahrenheit, which could only be achieved through air conditioning. *Ball*, 792 F.3d at 598. In reversing the district court, the Fifth Circuit held that the injunction violated the PLRA (Prison Litigation Reform Act) because the injunction was overbroad for a variety of reasons. First, the Fifth Circuit reasoned that prisoners—under the PLRA—are not entitled to the most effective available remedy, but, rather, are "entitled to a remedy that eliminates the constitutional injury." *Id*. at 599; *see also Rasho v. Jeffreys*, 22 F.4th 703, 713 (7th Cir. 2022) (explaining that "the Eighth Amendment does not require the most effective solution."). The Fifth Circuit in *Ball* expressly held that air conditioning is not necessary to correct the Eighth Amendment violation.

Relevant here, the Fifth Circuit further explained that the Constitution does not require the elimination of all risks related to heat illnesses. *Ball*, 792 F.3d at 599 ("Some risk is permissible and perhaps unavoidable."). The Fifth Circuit highlighted how the plaintiff's own expert explained that there were many acceptable remedies short of prison-wide air conditioning—such as diverting

cool air, allowing prisoners to access air-conditioned areas, allowing access to cool showers at least once a day, providing ample supply of cold water and ice at all times, supplying personal ice containers and personal fans, and installing additional ice machines. *Id*. The Court reasoned that such remedies "are precisely the types of remedies this court endorsed in *Gates v. Cook* and that the PLRA requires." *Id*.

The Fifth Circuit further found the injunction problematic because "it awarded relief facility-wide." *Id*. By ordering air conditioning through the prison unit, the district court provided an overbroad remedy—when a more appropriate remedy would be tailored to the individual plaintiffs.

Finally, the Fifth Circuit reversed the district court's permanent injunction because the district court failed to consider or order remedial measures of the type mentioned above in *Gates*. The *Gates* court required particular heat measures that included fans, ice water, ice, and showers "if the heat index reaches 90 degrees or above." *Id*. at 600 (citing *Gates*, 376 F.3d at 336). The Fifth Circuit held that even assuming that air conditioning was an acceptable remedy—which it expressly stated was not—the permanent injunction at issue was too broad when narrower relief, as in *Gates*, was appropriate. *Id*.

Here, Hardwick's request—prison-wide air conditioning at the Powledge Unit—is similarly problematic. Injunctive relief of this sort would run of afoul *Gates* and the Fifth Circuit's rejection of the injunction in *Ball*. Moreover, the uncontested summary judgment evidence reveals that prison officials at the Powledge Unit employ various heat-mitigation procedures similar to those in *Gates*, such as (1) providing all prisoners with a fan, (2) allowing cool-down showers, (3) providing ice water, (4) allowing access to respite areas with air conditioning, (5) recirculating air, and (6) permission to wear T-shirts and carry cooling towels. These mitigation strategies and

procedures satisfy the Eighth Amendment, and Hardwick failed to show that he is entitled to more extensive measures to combat the heat—including air conditioning.

Hardwick's heat claims mirror those found in *Cole v. Collier*, No. 14-cv-1698 (S.D. Tex., Ellison, J.). In *Cole*, which involved TDCJ's Pack Unit, prisoners formed a class action seeking injunctive relief from exposure to extreme heat. *See Sain v. Collier*, 2019 WL 4144321, at *5 (S.D. Tex. Aug. 30, 2019) (outlining the history, claims, and evidence presented in the *Cole* case). The general class consisted of "all inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas." *Id*. The parties engaged in mediation and reached a settlement agreement—in which TDCJ agreed to install air conditioning in the housing units where the class members resided and to maintain indoor heat indices at or below 88 degrees Fahrenheit between April 15 and October 15 each year. *Id*. at *6. Under the terms of the agreement, TDCJ plans to construct and install permanent air conditioning at the Pack Unit.

Hardwick's case here is not analogous to *Cole*. Injunctive relief was entered in *Cole* based on "an extensive factual record and was specifically tailored to conditions at the Pack Unit and the inmates' medical conditions." *See Taylor v. Collier*, 2019 WL 1383021, at *7 (S.D. Tex. Mar. 26, 2019). The uncontested summary judgment evidence here does not illustrate that current conditions at the Powledge Unit mirror the conditions previously found at the Pack Unit in 2017. Hardwick, in the wake of the Cole settlement, has not shown that TDCJ's heat mitigation program has been insufficient to reduce the risks of heat illness. *Sain*, 2019 WL 4144321, at *23 ("While the court does not ignore the evidence presented and the findings made in the *Cole* case, it looks primarily at whether the plaintiffs have presented evidence showing that efforts to implement

improvements to TDCJ's heat mitigation program in the wake of the *Cole* settlement have been effective to reduce the serious risk of harm posed by extreme heat.").

### b. Objective Component: Exposure to Substantial Risk of Harm

The uncontested summary judgment evidence reveals that TDCJ officials have developed and implement vast heat-mitigation strategies and procedures at the Powledge Unit, which is revealed in both the 2020 Administrative Directive 10.64 and Ms. Sandifer's affidavit. Among several other measures, prison officials at the Unit monitor the temperatures, both inside and outside the prison, document heat-related illnesses, evaluate the medical needs of individual prisoners by giving them a "Heat Sensitivity Score," and perform wellness checks. *See Sain*, 2019 WL 4144321, at *16 (explaining that TDCJ maintains a "process to place certain offenders who may be at increased risk of developing heat-stress illness in air-conditioned housing by assigning every offender in the TDCJ system … a Heat Sensitivity Score based on their medical conditions and prescribed medications.").

Other than self-serving assertions, Hardwick provides no evidence to even suggest that such heat-mitigation measures and requirements in AD-10.64 are insufficient to reduce heat-related illnesses or constitutionally deficient. *See Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013) ("Self-serving allegations are not the type of significant probative evidence required to defeat summary judgment.").  Accordingly, Hardwick has not met the objective component for an Eighth Amendment violation.

### c. Subjective Component: Deliberate Indifference

Hardwick must demonstrate that prison officials knew of and disregarded an excessive risk to his health or safety; the official must be aware of facts from which the inference can be drawn that a substantial risk of harm exists—and he must also draw the inference. *Valentine*, 993 F.3d at

281; *Farmer*, 511 U.S. at 837. In other words, he must show that the Defendants had subjective knowledge that he faced a substantial risk of harm and then disregarded that risk. *Id*. Actions by prison officials that are "merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004). The failure to alleviate a significant risk that the official should have perceived—but did not—also does not constitute deliberate indifference. *Farmer*, 511 U.S. at 836-40.

While the summary judgment evidence here illustrates that Defendants and prison officials knew about the extremely hot temperatures, as evidenced by the implementation of extensive heat-mitigation strategies throughout the Powledge Unit, the evidence also shows that Defendants did not disregard a substantial risk of harm to Hardwick's health and safety. As mentioned, the heat-mitigation strategies employed by prison officials at the Unit are extensive, and refute any claim that Defendants intentionally disregarded the risks of hot temperatures.

Hardwick complains mostly of his housing assignment. First, a prisoner does not have a constitutionally protected right to choose his housing. *See Poree v. Akwitti*, 834 F. App'x 934, 935 (5th Cir. 2021). Second, with respect to his heat concerns, the uncontested summary judgment evidence reveals that medical personnel determined that he does not have heat sensitivities and do not give him a "Heat Sensitivity Score." Hardwick alleges that he was treated for heat exhaustion in the past, but he fails to elaborate—and similarly fails to show through competent summary judgment evidence how his various medical conditions impair his ability to thermoregulate such that air conditioning or a prison transfer is required. *See Taylor v. Collier*, 2019 1383021, at *7 (S.D. Tex. Mar. 26, 2019) ("Simply put, Taylor's conclusory allegation that the heat affects his health is insufficient to defeat summary judgment on his Eighth Amendment claims.").

While the evidence shows that Hardwick has certain work-related restrictions involving heat and his disability, the evidence is devoid of housing restrictions related to heat. The evidence shows that when Hardwick complained in prison grievances about his housing assignment inside the Powledge Unit, prison officials reviewed his individual circumstances—including his medical records—and determined that he was appropriately housed, (Dkt. #30, Exhibit A). To the extent that Hardwick disagrees with medical personnel that he does not have "heat-sensitivities," such is mere disagreement with medical determinations that does not amount to deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Gobert*, 463 F.3d at 346 (mere disagreement with a course of treatment or dissatisfaction with medical treatment does not constitute deliberate indifference under the Eighth Amendment). His disagreement with medical treatment or diagnoses likewise do not state a claim under the ADA or the RA. *See Whetstone v. Hall*, 2018 WL 1022586, at *2 (N.D. Miss. Feb. 22, 2018) ("The ADA and RA exist to protect individuals from being discriminated against because they have disabilities; they do not exist to challenge a person's treatment for a disability.").

Simply because Hardwick experiences hot temperatures while imprisoned at the Powledge Unit does not mean that Defendants were deliberately indifferent to his health and safety. As mentioned, even if prison officials' heat-mitigation strategies are inept or ineffective such that Hardwick still experiences extreme temperatures, such does not constitute deliberate indifference. Because prison officials employ extensive heat-mitigation strategies at the Powledge Unit, the uncontested summary judgment evidence shows that Hardwick has not been deemed "heat sensitive" by medical personnel, and Hardwick provides nothing to controvert Defendants' evidence, he has not shown that any Defendant acted with deliberate indifference.  On this record,

Hardwick failed to show a genuine issue of material fact that Defendants are subjecting him to an unreasonable and unconstitutional risk of serious damage to his health based on his housing assignment at the Powledge Unit.

2. Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA)

Hardwick alleges that for purposes of both the ADA and the RA, he is "a qualified individual regarded as having a physiological or mental impairment that substantially limits one or more of his major life activities," (Dkt. #1, pg. 21). He maintains that TDCJ, the SCC, and TBCJ fail to reasonably accommodate prisoners with heat-sensitive disabilities, and that such disabilities cause them to suffer more pain and punishment than able-bodied prisoners. Hardwick further argues that he is qualified to participate in programs and activities at the Powledge Unit, such as imprisonment in the prisoner housing areas. However, despite Defendants TDCJ, TBCJ, Collier, and the SCC recognizing that he suffers from qualifying heat-sensitive disabilities because he is prescribed medications to treat his disabilities, the Defendants intentionally discriminate against him "by failing and refusing to protect him from temperature extremes," (Dkt. #1, pg. 22).

As an initial matter, neither the ADA nor the RA permit individual capacity claims or damages. *See* 42 U.S.C. §§ 1213(1)(B), 12132 (defining public entity to only include "any department, agency, … or other instrumentality of a State); *Martinez v. City of Buda, Tex.*, 2018 WL 837609, at *6 (W.D. Tex. Feb. 13, 2018) (collecting cases holding that individual defendants cannot be sued for violating the ADA); *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999). Therefore, to the extent that Hardwick sues any state official in an individual capacity, such claim should be dismissed.

The ADA and the RA are judged and evaluated under the same legal standards, and the same remedies are available under both. *Valentine*, 993 F.3d at 289 (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)). To show discrimination under the ADA, a plaintiff must prove:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Id.*; *see also Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020). The Supreme Court has held that modern prisons conduct many "services, programs, or activities" that confer "benefits" on prisoners—such as recreational activities, medical services, and vocational programs. *Pa. Dep't. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

Moreover, the ADA and RA "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennet-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). In order to prevail on a claim concerning alleged failure to accommodate, the plaintiff must prove (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. *See Smith*, 956 F.3d at 317 (citing *Ball*, 792 F.3d at 596). The entity must understand the limitations a plaintiff experienced as a result of his disability; the burden is on the plaintiff to identify the disability, the limitation, and to request accommodation in "direct and specific" terms. *See Valentine*, 993 F.3d at 290;

Even if a plaintiff demonstrates the failure to accommodate, or even disability-discrimination, he must show intentional discrimination. *See Smith*, 956 F.3d at 318. Deliberate indifference does not suffice. *Id.*; *see also Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002) ("[I]n order to receive compensatory damages for violations of the Acts, a plaintiff must

show intentional discrimination."); *Douthit*, 2022 WL 5249152, at *2 ("To recover compensatory damages under the ADA, a plaintiff must make a showing of intentional discrimination.")

Here, Hardwick fails to make a showing of a violation under the ADA or the RA. Hardwick identifies his disability in this cause as heat-sensitivities—several medical conditions that he claims render him more susceptible to heat-related illness. While he explains that he is an amputee that uses a wheelchair, he does not allege that Defendants are discriminating or failing to accommodate him on that basis.

However, he has not shown—or even pleaded—that any heat-sensitivities have substantially limited one or more of his life activities. A disability is "a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or . . . being regarded as having such an impairment. *See Haralson v. Campuzano*, 356 F. App'x 692, 697-98 (5th Cir. 2009). Major life activities are "those activities that are of central important to most people's everyday lives"—including, for example, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking breathing, learning, and working." *Id*. at 697 (citing 29 C.F.R. § 1630.2(i)); *see also Jenkins v. Cleco Power*, LLC, 487 F.3d 309, 315 (5th Cir. 2007).

The diagnosis of a medical condition, standing alone and without any evidence that it substantially affects one or more major life activities, is insufficient to trigger the protections of the ADA or the RA. *See Oswalt v. Sara Lee Corp.*, 74 F.2d 91, 92 (1995) (holding that Oswalt provided no evidence to show that either the high blood pressure or the alleged side effects from the medication substantially limits his job."); *Clark v. Livingston*, 2009 WL 2827991, at *4 (S.D. Tex. Sept. 1, 2009) ("As the Fifth Circuit explained, not every impairment, even if severe, is a

disability within the meaning of the ADA."). A major life activity includes the operation of a major bodily function.

Importantly, the Fifth Circuit has expressly declined to find that thermoregulation is a major life activity. *See Ball*, 792 F.3d at 597 n.11. In a separate non-binding case, the Southern District of Texas has recognized that thermoregulation—which is the body's ability to maintain a temperature of 98.6 degrees Fahrenheit—fits within the definition of a major life activity. *See McCollum v. Livingston*, 2017 WL 608665, at *34 (S.D. Tex. Feb. 2, 2017).

Even assuming, *arguendo*, that the body's ability to thermoregulate is a major life activity under the ADA, Hardwick failed to demonstrate or show that he has difficulty maintaining thermoregulation. *See Ball*, 792 F.3d at 597 ("There is no evidence that the prisoners' ailments have ever caused their body temperatures to rise above 98.6 degrees Fahrenheit."). In *Ball*, the Fifth Circuit highlighted that the majority of the prisoners' evidence "related to the future risk of heat stroke, not the prisoners' inability to maintain regular body temperature" and that testimony "focused generally on the risks to individuals with the same ailments as these prisoners, not on any limitations the prisoners presently experience." *Id*. The Fifth Circuit found that this evidence was fatal to the prisoners' ADA claims—even under an expanded definition of disability to include the inability to thermoregulate.

Here, Hardwick fails to show that he has difficulty maintaining thermoregulation. While he states that he has suffered from heat exhaustion previously, he provides no specifics and fails to elaborate. He neither connects that single episode of heat exhaustion to the inability to thermoregulate nor any other impairment of a major life activity. Hardwick, instead, stresses that his medical conditions or "heat sensitivities" render him more susceptible to heat illnesses—but the risk that he may suffer from elevated body temperature at some time in the future fails to prove

that he is unable to thermoregulate. *See Ball*, 792 F.3d at 597. Hardwick has not shown that his medical conditions render him unable to thermoregulate even with such extensive heat-mitigation procedures at the Powledge Unit.

The uncontested summary judgment evidence, moreover, indicates that Hardwick is not "heat sensitive." His Health Summary for Classification shows "Heat Sensitive: N," and he has no housing restrictions based on heat. Accordingly, given Hardwick's failure to show that his medical conditions render him unable to thermoregulate—coupled with the uncontested summary judgment evidence showing that the prison's medical department indicated that he is not heat sensitive—he has failed to demonstrate that his medical conditions substantially limit his ability to engage in one or more major life activities, which is fatal to his ADA/RA claims.

Hardwick further fails to demonstrate that he has been excluded from a program or service while housed at the Powledge Unit. The crux of his entire complaint is his dissatisfaction with his housing assignment because it is not air conditioned. However, Hardwick offers no support that air-conditioned housing or dorms inside a prison constitutes a "program or service," and, for reasons mentioned above, he has not shown that he is entitled to a housing accommodation based on a heat-related disability. As Defendants highlight in *Estate of A.R. v. Muzyka*, 543 F. App'x 363 (5th Cir. 2013), a plaintiff must show that he was denied access to services, programs, and activities.

In that case, a child was enrolled in a public school-operated program that taught and served disabled children—and suffered from hearing impairments and a seizure disorder. The child experienced a seizure during a pool activity, fell into the pool, and unfortunately drowned. *Id*. at 364. The parents of the child filed an ADA claim, and the Fifth Circuit ultimately held that they failed to state a claim under the ADA. In so doing, the Fifth Circuit explained that while there were

measures the school could have implemented, such was negligence. The Court further highlighted that the child was not denied access to the benefits of services, programs, and activities at the school. *Id*. at pg. 365 ("Tragically, A.R.'s death resulted from her inclusion in the full activities of a summer school that was not discriminatory under the case law or statute . . . ").

Similarly, here, Hardwick identifies no program, service, or activity that he has been intentionally excluded from. To the extent that he maintains that Defendants failed to make his housing safe due to the heat, given his failure to show that he is unable to thermoregulate, such a claim presents negligence—at most. *Id*. at 365 ("A.R. points out many things that the school could have done to make the situation safer for her in the pool area: additional lifeguards, different types of alarm devices, and so on. Even taking all the evidence A.R. presents as true, she at most only establishes negligence.").

Hardwick also fails to demonstrate that he was intentionally discriminated against by reason of his disability through his purported "heat-sensitivities." The Fifth Circuit has not extended ADA and RA claims to include prisoners' claims regarding poor medical treatment or inadequate facilities. *See Nottingham v. Richardson*, 499 App'x 368, 377 (5th Cir. 2012) ("The ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. There is no evidence that the allegedly improper action of leaving Nottingham on the floor of the transit van had any connection to his alleged disability."); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) ("We do not in this opinion hold that the ADA imposed on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.").

Instead, the prisoner must show that he was treated differently because of his disability. *See Nottingham*, 499 F. App'x at 377 ("There is no indication that he was treated differently

because of his disability."). Here, Hardwick's allegations suffer from a fundamental logic problem: The nature of his complaint is that he is <u>not</u> treated differently from other prisoners because he is being housed in the same conditions that experience extreme heat. Hardwick's articulation of the facts indicate that both disabled and non-disabled prisoners are housed in the same fashion. But, where disabled and non-disabled prisoners are subjected to the same conditions, an ADA or RA claim fails. *See Tuft v. Tex.*, 410 F. App'x 770, 775 (5th Cir. 2011) ("Despite complaining about such overcrowding, Tuft did not provide any summary judgment evidence showing that he and other prisoners with disabilities were treated differently from non-disabled prisoners."); *McDonald v. Cain*, 2012 WL 3726753, at *4 n.5 (M.D. La. Aug. 13, 2012) ("The plaintiff has not alleged, however, that he and other prisoners with disabilities were treated differently from non-disabled prisoners.").

Hardwick presents no evidence or facts that indicate he or other prisoners with heat-disabilities are treated differently from those without disabilities. His heat claims—the failure or refusal to house prisoners in air-conditioning—are based on conditions that are applicable to every prisoner housed within the Powledge Unit, thereby negating his own insistence that he is being treated differently from other prisoners. The Seventh Circuit succinctly explained:

> [T]he act [i.e., the ADA] would not be violated by a prison's simply failing to attend to the medical needs of its prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. . . . [H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about the incompetent treatment of his paraplegia.

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996).

Here, likewise, Hardwick's allegations show that he was not treated worse because he has alleged "heat sensitivities"—as all prisoners, disabled and non-disabled, are housed without air conditioning. Such is fatal to his ADA and RA claims. *See Hale v. Harrison Cnty. Bd. of*

25

*Supervisors*, 8 F.4th 399, 404 n.1 (5th Cir. 2021) ("Hale admits that the denial of his requested accommodations meant he was treated the same as 'everybody.' That admission is fatal to his discrimination claim because the ADA is not violated where the denial of an accommodation 'does not create a situation where disabled individuals ha[ve] an unequal ability to use and enjoy the facility compared to individuals who do not have a disability.'") (quoting *Providence v. Behavioral Health v. Grant Rd. Pub. Utility Dist.*, 902 F.3d 448, 459 (5th Cir. 2018)). Accordingly, Hardwick has presented no evidence illustrating that he was discriminated against by reason of his alleged "heat-sensitivities." All of his ADA and RA claims should be dismissed.

### 4. Qualified Immunity

Defendants seek qualified immunity. The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The first prong is whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir.

2009) (citation omitted). The second is "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citations omitted). A court may consider the two-pronged inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When applying the second prong, the court examines whether "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (internal alterations and quotation marks omitted). The Fifth Circuit has observed that an official:

> does not lose qualified immunity merely because a certain right is clearly established in the abstract. It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, but those abstract rules give officials little practical guidance as to the legality of particular conduct. Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful.

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (internal quotation marks omitted).

Here, Hardwick failed to establish a constitutional violation. He therefore failed to clear the first hurdle. Moreover, even if he had alleged a constitutional violation, he failed to show that any Defendant acted unreasonably. There is no constitutional right to an air-conditioned prison unit or housing, the uncontested summary judgment evidence shows that he is not "heat sensitive," and Hardwick failed to show any discrimination by reason of his alleged "heat-sensitivities." Furthermore, the evidence demonstrates that prison officials employ several heat-mitigation strategies and procedures—which he has not shown are insufficient. Because Hardwick has not identified a constitutional violation, Defendants are entitled to qualified immunity.

<u>5. Class Action</u>

Hardwick styles his complaint as one seeking class action. Defendants maintain that he improperly invokes a class action. Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  In pertinent part, the rule states:

> **(a) Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The Supreme Court has explained that Rule 23 does not set forth a mere pleading standard; rather, a party seeking class certification must affirmatively demonstrate his compliance with the Rule. *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011).

Moreover, the district court must conduct a rigorous analysis of the Rule 23 requirements before certifying class action.  *See General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).  The party seeking certification bears the burden of proof.  *Horton v. Goose Creek Ind. Sch. Dist.*, 690 F.2d 470, 486 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983).

Here, Hardwick failed to meet Rule 23 requirements. Specifically, while Hardwick insists that the complaint is brought for every prison at the Powledge Unit, he is the only signatory on the complaint. Moreover, the complaint does not address the questions of law or facts common to the prospective class; instead, Hardwick merely alleges that there are unique, shared circumstances. *See McGrew v. Texas Bd. of Pardons and Paroles*, 47 F.3d 158, 162 (5th Cir. 1995) (finding that plaintiff's motion for class certification—which alleged that there were numerous other inmates having an interest in his action, but failed to address the other requirements of Rule 23—was insufficient).

Additionally, Hardwick has not shown that he will fairly and adequately represent the interests of the class. Federal courts generally hold that *pro se* plaintiffs cannot fairly and adequately represent the interests of a class. *See Anderson v. Moore*, 372 F.2d 747, 751 n.5 (5th Cir. 1967); *Fymbo v. State Farm Fire & Cas. Co.*, 213 F.3d 1320, 1321 (10th Cir. 2000) (affirming the district court's decision that *pro se* litigant cannot adequately represent putative class). Here, Hardwick has failed to affirmatively demonstrate that he would fairly or adequately represent the class action. Any request for a class action should be denied.

<u>RECOMMENDATION</u>

For the foregoing reasons, it is recommended that Defendants' motion for summary judgment, (Dkt. #30), be granted and Plaintiff's claims be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections).

So ORDERED and SIGNED this 26th day of April, 2023.

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE